UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| HRC-HAINAN HOLDING COMPANY, LLC, | Case No. 19-mc-80277-TSH |
|---|---|
| Applicants, | |
| v. | **ORDER RE: APPLICANTS' MOTION TO COMPEL § 1782(A) DISCOVERY AND RESPONDENTS' MOTION TO QUASH** |
| YIHAN HU, et al., | Re: Dkt. Nos. 14, 15, 41 |
| Respondents. | |

## I.    INTRODUCTION

Applicants sought leave to serve subpoenas on Respondents under 28 U.S.C. § 1782 to obtain discovery for use in two proceedings, one arbitral and one before a court, in the People's Republican of China.  ECF No. 1.  The Court granted the Applicants' ex parte application.  ECF No. 5.  Respondents have moved to quash the subpoenas, ECF No. 15, and Applicants have moved to compel discovery, ECF No. 14.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** both motions.

## II.    BACKGROUND[1]

Applicants are HRC-Hainan Holding Company, LLC and D&W Holding Company, LLC, both Delaware companies, and Hainan HRC Hospital Management and Consulting, Co., Ltd. ("HRC-China"), a Chinese company 90% owned by HRC-Hainan and D&W.  Ex Parte Appl. ("Appl.") 1, ECF No. 1.

Applicants seek discovery for use in two proceedings in the People's Republic of China: (1) a private arbitration before the China International Economic and Trade Arbitration

---

[1] The parties have consented to magistrate judge jurisdiction.  ECF No. 33.

Commission ("CIETAC"), which Applicants recently commenced against Ciming Bo'ao International Hospital Co., Ltd. ("Ciming"); and (2) a lawsuit before the No. 1 Intermediate People's Court of Hainan Province (the "Hainan court"), which seeks to preserve assets in connection with the CIETAC arbitration.

## I. The CIETAC Arbitration and Underlying Conflict

The Applicants submitted their Request for Arbitration to CIETAC, which CIETAC formally accepted on September 6, 2019. Decl. of Liu Yang in Supp. of Appl. ("Liu Decl.") ¶ 5, ECF No. 2. Applicants' Request asserts that pursuant to a Collaboration Agreement with Ciming, Applicants invested $10 million to build and equip an in vitro fertilization ("IVF") center at Ciming's hospital in Hainan Province, People's Republic of China, and to enable Ciming to obtain a highly valuable government license to provide IVF services. *Id.* ¶ 2, Ex. 1, ¶ 1.2. After the license was granted in March 2019, Ciming acted in breach of the Collaboration Agreement to take possession of the IVF center and the license, and to push Applicants out of the management and operation of the IVF center. *Id.* ¶¶ 1.3. 10.2. After pushing Applicants out of the IVF center, Ciming began providing IVF services using the facility and equipment that Applicants had built and purchased, as well operating manuals and training materials that Applicants assert contain intellectual property and know-how licensed to them. *Id.* ¶. Ciming also sent a letter to Applicants purporting to unilaterally terminate the Collaboration Agreement in breach of the terms of the agreement. *Id.*

Applicants allege that Respondent Hu Yihan, a Chinese national who resides or was recently residing in the Northern District of California, signed the Collaboration Agreement on September 10, 2017 as Ciming's legal representative and 95% shareholder. *Id.* ¶¶ 3.1, 6.2. At the same time, Hu signed a "Letter of Undertaking" as an Appendix to the Collaboration Agreement, requiring Ciming to provide notice of any transfer of Ciming's equity and to obtain HRC-China's prior approval of any change in control of Ciming. *Id.* ¶ 7.2. Despite that undertaking, Hu transferred her 95% stake in Ciming in December 2017 to her mother, Han Xiaohong, without providing prior notice or obtaining HRC-China's consent. *Id.* ¶ 10.1. Han replaced Hu as the Legal Representative and Executive Director of Ciming. *Id.* Applicants allege that this transfer

also violated the Collaboration Agreement. *Id.*

Based on Ciming's breach of the Collaboration Agreement, Applicants seek from the arbitration an award of over RMB 143 million ($20 million), which includes compensation for the IVF license obtained by relying on Applicants' investments and technical support, as well as restitution of tangible and intangible property that Ciming wrongfully seized. *Id.* ¶¶ 1.4, 12.1-12.5, 13.1-13.2.

CIETAC confirmed the constitution of the Arbitral Tribunal (the "Tribunal") on October 25, 2019. Liu Decl. ¶ 6. The Tribunal conducted hearings on November 29 and 30, 2019, in Beijing. Decl. of Liu Yang in Supp. of Mot. to Compel ("Liu Compel Decl.") ¶ 5, ECF No. 14-21. At the time of the hearings, Applicants had served the document and deposition subpoenas that are the subject of these § 1782 proceedings. *Id.* ¶ 6. The Tribunal asked Applicants about a timeline for submission of additional evidence and gave the parties until the end of December 2019 to submit such evidence. *Id.* ¶¶ 5-6. On December 2, 2019, the Tribunal issued an order setting a deadline for supplemental evidence of January 2, 2020. *Id.* ¶ 8; Joint Ex. ("JX") 12, ECF No. 14-13. That same day Applicants applied to the Tribunal requesting to extend the deadline to submit evidence until the end of February 2020. JX 13, ECF No. 14-14. On December 5, Applicants submitted a further statement to the Tribunal, informing the Tribunal that it was unlikely it could submit evidence before January 2, 2020 and requesting an extension of the deadline. *Id.* ¶ 9. In their statement, Applicants informed the Tribunal that this Court would be holding a hearing in January 2020 on Respondents challenge to the § 1782 discovery. *Id.* On December 23, 2019, the Tribunal extended the deadline to submit additional evidence from January 2 to January 23, 2020. JX 16.

II.     The Hainan Asset Preservation Case

On September 20, 2019, HRC-China applied to the Hainan court to freeze RMB 143 million ($20 million) of Ciming's assets to ensure that an award in the CIETAC arbitration, if Applicants obtain one, can be enforced. Liu Decl. ¶¶ 9-10, Ex. 3. The Hainan court granted the application on September 27, 2019, authorizing the freeze of RMB 143 million of Ciming's assets including bank deposits. *Id.* ¶¶ 11-12; ¶ 11, Ex. 4. However, only a small amount, less than RMB

645,000 (about $90,000), in bank deposits were frozen due to insufficient funds in accounts of Ciming identified by Applicants.  *Id.* ¶ 12.  Applicants assert that Ciming is a large hospital with over RMB 57 million (about $8 million) in paid-in capital.  *Id.* ¶ 13.  They believe that Ciming transferred its assets to other locations not known to them, *id.*, including to persons or entities in this District.

### III.  The Parties from Whom Discovery Is Sought in this Matter

Applicants sought discovery under § 1782 of three individuals and four entities.  The individuals are: Hu Yihan, who signed the Collaboration Agreement as Ciming's legal representative, and then allegedly transferred her 95% stake in Ciming to Han Xiaohong, her mother, without HRC-China's consent and thus in violation of the Collaboration Agreement; Han Xiaohong, who is the current 95%-owner of Ciming, and who Applicants believe is the driving force behind Ciming's unlawful seizure of the IVF Center; and Hu Bo, Hu Yihan's father, who owns the other 5% of Ciming and co-signed with Hu Yihan a Letter of Intent in December 2016 that set forth the Collaboration Agreement's basic terms.  *Id.* ¶¶ 6.5, 10.2.  Three of the entities are California limited liability companies formed by Hu Yihan: HuHanOne LLC, HuHanTwo LLC, and HuHanThree LLC.  *See* Decl. of Grant L. Kim in Supp. of Appl. ("Kim Decl.") ¶¶ 2-4, Exs. A-C, ECF No. 3.  Hu Yihan is the manager of the companies and owns a 100% equity interest in HuHanThree, and Hu Bo holds a 100% equity interest in HuHanOne and HuHanTwo.  Decl. of Yihan Hu ("Hu Y. Decl.") ¶ 7, ECF No. 15-2.  The HuHan entities have since 2015 purchased over $31 million in real estate in the Bay Area, but otherwise don't engage in any apparent business in this district.  Kim Decl. ¶¶ 6-8, Exs. E-G.  The fourth is Wells Fargo Bank, which Applicants believe maintains an account of Hu Yihan and also, potentially, accounts for the parents or the LLCs.  *Id.*  ¶ 15.

Subsequent to the Court granting Applicants' Application, they served the subpoenas on Hu Yihan, HuHanOne, HuHanTwo, HuHanThree and Wells Fargo, JXs 1-5.  They have not served Han Xiaohong or Hu Bo, and have not moved to compel compliance with those subpoenas, JXs 6-7.  Opp'n to Mot. to Quash at 16, ECF No. 17.  Accordingly, Respondents move to quash only those subpoenas which have been served, and the Court will address only those subpoenas

here.

### III.   LEGAL STANDARD

Section 1782 provides, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . .  The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced . . . .

28 U.S.C. § 1782(a).  That language "has been distilled to permit district courts to authorize discovery where three general requirements are satisfied: (1) the person from whom the discovery is sought 'resides or is found' in the district of the district court where the application is made; (2) the discovery is 'for use in a proceeding in a foreign or international tribunal'; and (3) the application is made by a foreign or international tribunal or 'any interested person.'"  *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019) (quoting § 1782(a)).

Once those three statutory requirements are met, a district court has wide discretion to grant discovery under § 1782.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260-61 (2004); *Four Pillars Enters. Co. v. Avery Dennison Corp.*, 308 F.3d 1075, 1079 (9th Cir. 2002) ("But the magistrate judge in granting some of the relief requested . . . and denying the rest, was exercising the broad discretion traditionally conferred upon the trial courts in such discovery matters.").  In exercising its discretion, a district court should be guided by the following factors: (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome."  *Intel,* 542 U.S. at 264-65.  However, a district court need not explicitly address every factor, nor is it confined to the four *Intel* factors in deciding whether to exercise its broad discretion.  *See Akebia Therapeutics, Inc. v. Fibrogen, Inc.*, 793 F.3d 1108,

1112 (9th Cir. 2015) ("The district court was not required to address explicitly every factor or argument, nor was it required to issue a written order.") (citing *United States v. Sealed 1*, 235 F.3d 1200, 1206 (9th Cir. 2000) (noting the broad discretion afforded the district courts under § 1782). A district court's discretion is to be exercised in view of the twin aims of § 1782, "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Intel,* 542 U.S. at 252 (citation and internal quotation marks omitted).

## IV. DISCUSSION

### A. Statutory Requirements

#### 1. Whether the Respondents Reside or Are Found in this District

The Court turns first to the statutory requirements of § 1782, the first of those being that the person or entity from whom the discovery is sought reside or be found in this District. This requirement is met, as Hu Yihan, the three LLCs, and Wells Fargo can all be found in this District. The LLCs are California entities registered with the California Secretary of State as having principal offices in Atherton or Palo Alto, which are within this District. Kim Decl. ¶¶ 2-4, Exs. A-C. A business entity is "found" in the judicial district where it has its principal place of business. *Digital Shape Techs., Inc. v. Glassdoor, Inc.*, 2016 WL 6995881, at *3 (N.D. Cal. Nov. 30, 2016) ("found-in" requirement of § 1782 satisfied where entity had "principal place of business" within the Northern District of California). Also, in each of the Statements of Information made with the Secretary of State, Hu Yihan is listed as the manager with the same California addresses as the LLCs, so she is found in this District. And Wells Fargo is headquartered in San Francisco, making it also found here. *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016) (companies found in the Northern District of California because they were headquartered here).

#### 2. Whether § 1782(a) Applies to the Foreign Proceedings

##### a. The CIETAC Arbitration

On the second requirement, that the discovery sought be "for use in a proceeding in a foreign or international tribunal," the parties—along with countless federal courts—disagree on

whether "tribunal" as used in the statute encompasses a private arbitral tribunal such as the CIETAC proceeding. The Ninth Circuit has not yet decided the issue. There is a split between at least three other circuits on the issue. The Second and Fifth Circuits have held that § 1782(a) applies to international arbitrations, but only governmental or intergovernmental arbitral tribunals, and not those established exclusively by private parties. *National Broadcasting Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d Cir. 1999) ("*NBC*"); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir. 1999). The Sixth Circuit, very recently, broke with the Second and Fifth and held that § 1782(a) does apply to strictly private, non-governmental arbitrations. *Abdul Latif Jameel Transp. Co. v. FedEx Corp. (In re Application to Obtain Discovery for Use in Foreign Proceedings)*, 939 F.3d 710, 717-731 (Sept. 19, 2019) ("*ALJ*"). Additionally, countless district courts, in this Circuit and others, have written at length on the issue. *See, e.g.*, *In re Gov't of the Lao People's Democratic Republic*, 2016 U.S. Dist. LEXIS 47998, at *10-18 (D. N. Mar. I. Apr. 7, 2016); *In re Dubey*, 949 F. Supp. 2d 990, 992-95 (C.D. Cal. June 7, 2013); *In re Application of Babcock Borsig AG*, 583 F. Supp. 2d 233, 237-40 (D. Mass. 2008). After a careful reading of the circuit opinions, and examining the legislative record and secondary sources, the Court agrees with the Sixth Circuit that § 1782(a) applies to private arbitral tribunals.

*NBC*, *Biedermann*, and *ALJ* thoroughly discussed the issue of whether 1782(a) applies to private arbitral tribunals, and the parties are both aware of and ask the Court to decide between those opinions, so there is no need here to rehash them or reinvent the wheel or try to say better what those courts have already said well enough. The Court will only summarize the main reasoning here, before explaining why it agrees with *ALJ*. Additionally, because the Fifth Circuit elected to follow the Second Circuit's decision in *NBC*, 168 F.3d at 881, and because the analysis in *Biedermann* is largely encompassed in *NBC*, the Court will discuss only *NBC* and *ALJ*.

### i. NBC

In *NBC*, the Second Circuit started by attempting to ascertain the "ordinary or natural meaning" of the phrase "foreign of international tribunal." 165 F.3d at 188. It found that the term "is sufficiently ambiguous that it does not necessarily include or exclude" privately constituted arbitrations. *Id.* Responding to that ambiguity, the court proceeded to look at the legislative

history of § 1782(a) to determine the meaning of "tribunal" as used in the statute. The court noted that "[t]he current version of § 1782 was enacted in 1964 as part of legislation to implement recommendations of the Commission on International Rules of Judicial Procedure . . . a body created by Congress in 1958 to 'study existing practices of judicial assistance and cooperation between the United States and foreign countries with a view to achieving improvements.'" 165 F.3d at 188-89 (quoting Pub. L. No. 85-906, § 2, 72 Stat. 1743 (1958)). The court noted that the § 1782 that emerged in 1964 replaced the older version "which had provided limited evidence-gathering assistance to a 'judicial proceeding in any *court* in a foreign country.'" 165 F.3d at 189 (quoting the version of § 1782 in effect prior to the 1964 revisions). The court recognized that the change in language to "in a proceeding in a foreign or international tribunal" in the 1964 version "'[was] used to make it clear that assistance is not confined to proceedings before conventional courts,' to which the predecessor statute had been expressly limited." 165 F.3d at 189 (quoting H.R. Rep. No. 88-1052, at 9 (1963); S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788) ("Senate Report"). "Nonetheless," the court found, "it is apparent in context that the authors of these reports had in mind only governmental entities, such as administrative or investigative courts, acting as state instrumentalities or with the authority of the state." 165 F.3d at 189.

In particular, the court found support for a more restrictive reading in the legislative history of 22 U.S.C. §§ 270-270g.[2] It noted that "Congress had enacted §§ 270-270c in 1930 in direct response to problems that arose in an arbitration proceeding between the United States and Canada, and §§ 270d-270g in 1933 explicitly to accommodate proceedings before the United States-German Mixed Claims Commission." 165 F.3d at 189. But "§§ 270d-270g were said to improperly limit the availability of assistance . . . to controversies to which [the U.S. was] a formal party." (citation and internal quotation omitted). Thus, the court found, "the 1964 legislation was

---

[2] The court noted that the repealed sections 270-270g are "nowadays difficult to find," and so set them forth in an Appendix A. *See* 165 F.3d at 191-93. Of pertinence here, the sections "authorized commissioners or members of international tribunals to administer oaths, to subpoena witnesses or records, and to charge contempt." *Id.* at 189. But, the Second Circuit emphasized, "[t]here is no question that the statute applied only to intergovernmental tribunals." *Id.*

intended to broaden the scope of the repealed 22 U.S.C. §§ 270-270g by extending the reach of the

surviving statute [§ 1782(a)] to *intergovernmental* tribunals not involving the United States." *Id.*

at 190 (emphasis added). The court also found significant that the legislative history didn't

specifically mention private arbitrations. *Id.* ("The absence of any reference to private dispute

resolution proceedings such as arbitration strongly suggests that Congress did not consider them in

drafting the statute."). It concluded that "the legislative history reveals that when Congress in

1964 enacted the modern version of § 1782, it intended to cover governmental or

intergovernmental arbitral tribunals and conventional courts and other state-sponsored

adjudicatory bodies." *Id.* at 190.

The Second Circuit also found that policy considerations reinforced its conclusion that §

1782(a) does not apply to private arbitrations. In particular, the court expressed concern that

allowing discovery under § 1782 for use in arbitral tribunals would be at odds with the efficiency

and cost-effectiveness of arbitration. *Id.* at 190-91. "Furthermore," the court wrote, "such broad

discovery in proceedings before 'foreign or international' private arbitrators would stand in stark

contrast to the limited evidence gathering provided in 9 U.S.C. § 7[3] for proceedings before

domestic arbitration panels." *Id.* at 191.[4] The court opined, "[s]uch an inconsistency not only

---

[3] Section 7 reads:

> The arbitrators selected either as prescribed in this title or otherwise, or a majority of them, may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case. The fees for such attendance shall be the same as the fees of witnesses before masters of the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States district court for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner provided by law for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States.

9 U.S.C. § 7.

[4] The court characterized the methods for obtaining evidence under 9 U.S.C. § 7 as "more limited than those under § 1782 in two, and possibly three, ways":

would be devoid of principle, but also would create an entirely new category of disputes concerning the appointment of arbitrators and the characterization of arbitral panels as domestic, foreign, or international." *Id.* Therefore, the court concluded, "it is our view that Congress intended not this broad result, but rather only the limited expansion described in the House and Senate reports[,]" *id.*, to wit, an expansion that included only governmental or intergovernmental arbitral tribunals.

### ii.    ALJ

The Sixth Circuit opined that the Second Circuit turned to legislative history too early in the interpretation process. 939 F.3d at 726. The court explained, "we agree that dictionary definitions *alone* do not necessarily produce the conclusion that 'tribunal' extends" to private arbitrations, "however, courts' longstanding usage of the word shows not only that one permissible meaning of 'tribunal' includes private arbitrations but also that that meaning is the best reading of the word in this context." *Id.* at 726-27. In particular, the court found that "courts used the word ["tribunal"] to describe private, contracted-for commercial arbitrations for many years before Congress added the relevant language to § 1782(a) in 1964." *Id.* at 720 (citing

---

First, § 7 explicitly confers authority only upon arbitrators; by necessary implication, the parties to an arbitration may not employ this provision to subpoena documents or witnesses. Second, § 7 explicitly confers enforcement authority only upon the "district court for the district in which such arbitrators, or a majority of them, are sitting." Third, the express language of § 7 refers only to testimony before the arbitrators and to material physical evidence, such as books and documents, brought before them by a witness; open questions remain as to whether § 7 may be invoked as authority for compelling pre-hearing depositions and pre-hearing document discovery, especially where such evidence is sought from non-parties.

165 F.3d at 187-88 (citations omitted).

10

multiple examples from state supreme courts[5], the Sixth Circuit[6], and the U.S. Supreme Court[7]). "These sources," the court opined, "show that American lawyers and judges have long understood, and still use, the word 'tribunal' to encompass privately contracted-for arbitral bodies with the power to bind the contracting parties." *Id.* at 721. The court then considered other uses of the word "tribunal" in the same statute and found that they did not dictate a more limited reading of the word than its long-understood meaning. *Id.* at 722. The court concluded that "the text, context, and structure of § 1782(a) provide no reason to doubt that the word 'tribunal' includes private commercial arbitral panels established pursuant to contract and having the authority to issue decisions that bind the parties." 939 F.3d at 723. On that, the court concluded, "we need look no further to hold that the [private arbitral] panel is a 'foreign or international tribunal' . . . ." *Id.*; *id.* at 727 (Because a usage of "tribunal" that includes private arbitrations was the best reading of the word in context, it was "not necessary or appropriate to consult extra-textual sources of information.") (citing *Lamie v. United States Tr.*, 540 U.S. 526, 539 (2004)).

Nevertheless, the Court considered the Second Circuit's findings vis-à-vis legislative history. It found nothing in the history that indicated that privately constituted tribunals should be excluded from the meaning of "foreign or international tribunal." *Id.* at 728. If anything, the court found, what the legislative record made clear was Congress's intent to expand § 1782(a)'s applicability. *Id.* ("The facts on which the legislative history is most clear are that the substitution of 'tribunal' for 'judicial proceeding' broadened the scope of the statute, and the repeal of 22

---

[5] Those cases, in the order the Sixth Circuit discussed or cited them: *Henry v. Lehigh Valley Coal Co.*, 64 A. 635, 636 (Pa. 1906); *Eastern Engineering Co. v. Ocean City*, 167 A. 522, 523 (N.J. 1933); *In Susong v. Jack*, 48 Tenn. 415, 416-17 (1870); *Park Constr. Co. v. Indep. Sch. Dist.*, 296 N.W. 475, 477 (Minn. 1941); *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Can., Local Union 525, Las Vegas v. Stine*, 351 P.2d 965, 974 (Nev. 1960); *Astoria Med. Grp. v. Health Ins. Plan*, 182 N.E.2d 85, 87 (N.Y. 1962); *Gilbert v. Burnstine*, 237 N.Y.S. 171, 178 (N.Y. Sup. Ct. 1929), *rev'd*, 174 N.E. 706 (N.Y. 1931); *Comm'rs v. Carey*, 1 Ohio St. 463, 468 (1853); *Green & Coates Sts. Passenger Ry. Co. v. Moore*, 64 Pa. 79, 91 (1870); *Giannopulos v. Pappas*, 15 P.2d 353, 356 (Utah 1932).

[6] *Toledo Steamship Co. v. Zenith Transportation Co.*, 184 F. 391, 400 (6th Cir. 1911).

[7] Those cases, in the order cited: *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198 (1956); *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 185 (1955) (Black, J., dissenting), *overruled by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988); *Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 121 n.1 (1924); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 636 (1985).

United States District Court
Northern District of California

U.S.C. §§ 270-270g removed the requirement that the United States be a party to an international agreement under which a proceeding takes place.").

Responding to the concern that "§ 1782(a) provides broader discovery than is available to parties in domestic arbitration under the [FAA]," 939 F.3d at 728, the court pointed to *Intel*, where the Supreme Court wrote:

> *We also reject Intel's suggestion that a § 1782(a) applicant must show that United States law would allow discovery in domestic litigation analogous to the foreign proceeding.* Section 1782 is a provision for assistance to tribunals abroad. It does not direct United States courts to engage in comparative analysis to determine whether analogous proceedings exist here.

*Id.* at 729 (quoting *Intel*, 542 U.S. at 261) (emphasis added by the Sixth Circuit). The court also noted that the majority in *Intel* rejected the suggestion that "a § 1782(a) applicant must show that United States law would allow discovery in domestic litigation analogous to the foreign proceeding." 542 U.S. at 270. Instead, the Sixth Circuit noted, in detailing discretionary factors for district courts in § 1782 proceedings the Supreme Court stated, "a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country *or the United States*." 939 F.3d at 729 (quoting *Intel*, 542 U.S. at 264) (emphasis added by Sixth Circuit). Applying that reasoning, the Sixth Circuit "decline[d] to conclude that simply because similar discovery devices may not be available in domestic private arbitration, § 1782(a) categorically does not apply to foreign or international private arbitration." 939 F.3d at 730.

Finally, in addressing concerns about the impact of § 1782 on the efficiency of private arbitral tribunals, the Sixth Circuit noted that the Supreme Court "has made clear that district courts enjoy substantial discretion to shape discovery under § 1782(a)" "and the district court may withhold or shape discovery assistance accordingly." 939 F.3d at 730 (citing *Intel*, 542 U.S. at 261, 262, 265). "To sum up," the court wrote, "none of the policy arguments . . . affect our conclusion that the word 'tribunal' in § 1782(a) encompasses private, contracted-for commercial arbitrations of the type at issue here.'" 939 F.3d at 730.

### iii. Section 1782(a) applies to private arbitral tribunals.

As said earlier, this Court finds the Sixth Circuit's conclusion to be the correct one,

particularly in light of *Intel*. The Court agrees with the Sixth Circuit's conclusion that the ordinary meaning of "tribunal" draws the conclusion that it § 1782(a) applies to private arbitral tribunals. A court's "search for Congress's intent begins with 'the plain meaning of the language in question.'" *Cooper v. FAA*, 622 F.3d 1016, 1028 (9th Cir. 2010) (quoting *United States v. 144,774 pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005)). "To discern the text's plain meaning, 'words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Cooper*, 622 F.3d at 1028 (quoting *144,774 pounds of Blue King Crab*, 421 F.3d at 911). "If the relevant language is plain and unambiguous, [the] task is complete." *Cooper*, 622 F.3d at 1028 (citing *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005)). As the Sixth Circuit demonstrated, the ordinary meaning of "tribunal" has long encompassed "privately contracted-for arbitral bodies with the power to bind the contracting parties," 939 F.3d at 721-22, including at the time the current version of § 1782(a) was adopted. *See* cases cited *supra* notes 5, 6, 7. And as *ALJ* noted, other uses of "tribunal" in the same statute and chapter of the code are "not inconsistent with a definition of the word that includes private arbitrations." *Id.* at 722-23.

Looking to legislative history this Court, like the Sixth Circuit, does not find in the legislative history any clear signal that Congress intended to exclude private arbitral tribunals from "foreign and international tribunals." The Second Circuit found support for a more restrictive reading in the legislative history of 22 U.S.C. §§ 270-270g. It might well be that the "'undesirable limitations,'" 165 F.3d at 190 (quoting House and Senate reports), of that statute were part of the impetus to expand discovery available under § 1782(a). But there's nothing to suggest that Congress intended to stop there and shape the contours of § 1782(a) based only on a statute passed 30 years earlier. *See ALJ*, 939 F.3d at 728 ("Although FedEx Corp. argues that there is nothing in the legislative history suggesting the expansion extended to private arbitration, this argument fails to appreciate that the legislative history does not indicate that the expansion stopped short of private arbitration.") (citation and internal quotation marks omitted); Senate Report ("In view of *the constant growth of administrative and quasi-judicial proceedings all over the world*, the necessity for obtaining evidence in the United States may be as impelling in proceedings before a foreign administrative tribunal or quasi-judicial agency as in proceedings before a conventional

court.") (emphasis added); *id.* ("Finally, the assistance made available . . . is also extended to international tribunals and litigants before such tribunals.").

The Court also gives great weight, like the Sixth Circuit did, to *Intel*'s clear rejection of a "suggestion that § 1782(a) applicant must show that United States law would allow discovery in domestic litigation analogous to the foreign proceeding." 542 U.S. at 263. In rejecting that limitation, the Supreme Court cited a specific passage from the petitioner's brief where the petitioner argued, "if AMD were pursuing this matter in the United States, U.S. law would preclude it from obtaining discovery of Intel's documents." *Id.* That was precisely the concern the Second Circuit had about § 1782(a) allowing more discovery than would be allowed domestically under the FAA, so *Intel* cautions this Court against giving weight to that concern.

Lastly, the Court is not as persuaded by policy concerns as was the Second Circuit. It is true that part of "the popularity of arbitration rests in considerable part on its asserted efficiency and cost-effectiveness," and that such characteristics might be "at odds with the broad-ranging discovery made possible by the Federal Rules of Civil Procedure." 165 F.3d at 190-91. But § 1782(a) merely allows a district court to authorize discovery under certain circumstances; it does not require the foreign or international tribunal to accept evidence produced by that discovery. The tribunal can simply refuse such evidence if it would burden the efficiency of proceedings. And the risk of an unwanted pile of discovery landing on a tribunal's doorstep is reduced by the fact that district courts are advised to consider the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to United States federal-court assistance. *Intel*, 542 U.S. at 264. Finally, although the value of arbitral tribunals comes from their efficiency and cost-effectiveness, it also comes from their ability to fairly adjudicate disputes based on evidence; if § 1782(a) can from time to time help those tribunals get the evidence they need to reach more informed decisions, than certainly that serves the purpose of such proceedings.

The Court finds a private arbitration is a "foreign or international tribunal" for purposes of § 1782(a). The CIETAC proceeding meets the second requirement.

**b.  The Hainan Court Proceeding**

14

Respondents also assert that the Hainan court proceeding does not satisfy the requirement that discovery sought be "for use in a proceeding in a foreign or international tribunal," because they assert that the Hainan proceeding is "limited and non-adjudicatory" in nature. They assert that *Intel* held that "[s]ection 1782 only applies to tribunals that adjudicate disputes and issue dispositive rulings." Mot. to Quash at 12, ECF No. 15. Whether or not *Intel* should be read that way—and the Court expresses no opinion here—there is no question that the Hainan court is a court that adjudicates disputes and issues dispositive rulings. It has already made such a ruling in this case. It held that "the Application for Assert Preservation satisfied the legal requirements for preservation of asset[s]," and it issued a ruling freezing RMB 143,310,295.08 of Respondents' assets. Liu Decl., ¶ 5, Ex. 4. It also enjoined Ciming from using the IVF Center medical devices for new patients and allowed HRC-China to enter the IVF Center to take photos and make copies of documents, rulings that affected the parties' legal rights. There is no question these types of rulings are part and parcel of the functions of a conventional court. *See Aponte v. Calderon*, 284 F.3d 184, 194 (1st Cir. 2002) ("If any action of the Commission alters the appellees' legal rights, then there has been an adjudication.") (citing *Hannah v. Larche*, 363 U.S. 420, 441 (1960) (commission "does not adjudicate" because it "does not and cannot take any affirmative action which will affect an individual's legal rights"). And Applicants assert that if they can identify additional assets, they are able to submit that information to the Hainan court and may be able to freeze additional assets. Liu Compel Decl. ¶¶ 25-26.

The Hainan Court proceeding also meets the second requirement.

### 3. Whether the Applicants Are Interested Parties

Third, a litigant in a foreign civil litigation is an "interested person" for purposes of Section 1782. *See Intel*, 542 U.S. at 256-57; *Qualcomm Inc.*, 2018 WL 3845882, at *2 (N.D. Cal. Aug. 13, 2018). Applicants are parties to both the CIETAC arbitration and Hainan court proceeding. They are therefore interested persons for purposes of the statute.

## B. Discretionary *Intel* Factors

### 1. Respondents are not participants in the foreign actions.

"A foreign tribunal has jurisdiction over those appearing before it, and can itself order

15

them to produce evidence.  In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264.  The respondent in the CIETAC and Hainan Court proceedings is Ciming.  The fact that Respondents are not parties to those proceedings favors approval of the § 1782 application.

### 2. The foreign tribunals would be receptive to U.S. judicial assistance.

Under the second *Intel* factor, courts consider the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government or tribunal to U.S. federal-court judicial assistance.  *Intel*, 542 U.S. at 264.  The Supreme Court has noted that the absence of permissible discovery in a foreign jurisdiction does not necessarily signal objection to aid from U.S. courts.  *Id.* at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions--reasons that do not necessarily signal objection to the aid from United States federal courts.") (citing *In re Application Pursuant to 28 U.S.C. 1782 for an Order Permitting Bayer AG*, 146 F.3d 188, 194 (3d Cir. 1997) ("[T]here is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.")).

Applicants' Chinese counsel, Liu Yang, opined that Applicants would be entitled to submit to the CIETAC Tribunal evidence obtained through § 1782.  Liu Decl. ¶ 7.  The record indicates that the Tribunal would be receptive to such evidence: after Applicants applied for an extension of the deadline to submit evidence and informed the Tribunal that this Court would be holding a hearing in January 2020 on Respondents challenge to the § 1782 discovery, the Tribunal extended the deadline to submit additional evidence from January 2 to January 23, 2020.  Respondents counter that because the Tribunal issued a "middle-ground ruling on the deadline to submit evidence," and extended the deadline to January 23 instead of February 29, 2020 as Applicants had requested, it is evident the Tribunal "does not want or will not accept" evidence obtained through § 1782.  Mot. to Quash 16.  But if the Tribunal really "did not want" or found of "limited probative value" such evidence, why would it have extended the deadline at all?  The Tribunal's middle-ground ruling was likely a response to Ciming's "lengthy opposition" to Applicants'

request for extension.  *Id.*

Also, Applicants have persuaded the Court that the CIETAC Tribunal would likely be receptive to evidence submitted even after the January 23, 2020 deadline, especially considering disruptions to Applicants' and other CIETAC proceedings on account of the coronavirus outbreak currently affecting China.  *See* Second Supp. Decl. of Patrick Zheng in Supp. of Mot. to Compel ("2d Supp. Zheng Decl.") ¶¶ 4-23, ECF No. 43-1.  Of particular note, while the Tribunal set an evidence deadline of January 23, 2020 in its December 23, 2019 order, it left open the possibility of it accepting new evidence if it "deems it necessary."  JX 16.  Zheng opined that "it is not common for the tribunal to state that it may consider new evidence submitted after [a deadline] date if necessary.  There was no reason to include this somewhat unusual qualification unless the Tribunal is, in fact, prepared to consider new evidence submitted after the deadline if necessary."  Zheng Decl. ¶ 12.  And according to Zheng's Declaration, *Ciming* on one occasion submitted evidence 10 days past the deadline for such evidence, and the Tribunal decided to consider that evidence over Applicants' objections.  Zheng Decl. ¶ 15.  This was after the Tribunal had directed the parties to "strictly" follow the deadline and informed them that "the Tribunal will not consider new evidence submitted beyond that date unless it is deemed *absolutely* necessary."  *Id.* ¶ 14, Ex. 2 (emphasis added).  Thus, the CIETAC Tribunal has not expressed any opposition to late evidence.

Lastly, Respondents have not made any argument or highlighted any facts suggesting that the Hainan court would be unreceptive to evidence obtained through § 1782(a).  The Court finds this factor weighs in favor of granting the application.

### 3. There is no circumvention of foreign discovery limitations

The third *Intel* factor concerns whether the applicant is attempting to circumvent foreign proof-gathering restrictions.  *Intel*, 542 U.S. at 264-65.  A petitioner seeks to circumvent foreign discovery restrictions when it seeks discovery that cannot be obtained because the foreign jurisdiction or tribunal prohibits the discovery of those documents.  *See In re Accent Delight Int'l*, 2019 U.S. App. LEXIS 33785, at *8 (2d Cir.) ("[T]here is a difference between a § 1782(a) request that seeks documents that cannot be obtained . . . because the foreign jurisdiction

does not provide a mechanism for such discovery, and one that seeks documents that cannot be obtained because the foreign jurisdiction prohibits the discovery of those documents.")

(citing *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015)). The fact that more evidence may be obtained via a § 1782 application than via the foreign discovery procedures does not amount to circumvention and does not militate against approval of the application. *In re Nikon Corp.*, 2017 U.S. Dist. LEXIS 171949, 2017 WL 4647753, at *4 (N.D. Cal. Oct. 16, 2017); *In re Raiffeinsenbank*, 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016); *see also Appls. of Heraeus Kulzer, GmbHv. Biomet, Inc.*, 633 F.3d 591, 597 (7th Cir. 2011) (that an applicant "cannot obtain even remotely comparable discovery by utilizing German procedures" was not circumvention and was not a basis to deny an application under § 1782).

Here, the Court finds no evidence that an order authorizing § 1782 discovery would circumvent discovery in either the CIETAC Tribunal or the Hainan court. Applicants' Chinese counsel, Liu Yang, affirmed that obtaining and submitting evidence to the CIETAC Tribunal or Hainan Court would not be contrary to those bodies' rules or to any restrictions on proof-gathering under Chinese law." Liu Decl. ¶¶ 7, 14. Respondents have not disputed those statements, and the Court finds them supported in other opinions. *See, e.g.*, *In re Ex Parte Application of TPK Touch Sols. (Xiamen) Inc.*, 2016 WL 6804600, at *3 (N.D. Cal. Nov. 17, 2016) ("TPK asserts that there are no Chinese restrictions or policies that would prohibit seeking discovery of documents requested by the subpoena, and the discovery sought is consistent with the type of discovery available in the Chinese proceedings.") (factor weighed in favor of application); *Ex parte Application of Am. Petroleum Inst. for Order to Obtain Discovery for Use in Foreign Proceedings*, 2011 WL 10621207, at *2 (N.D. Cal. Apr. 7, 2011) ("API represents that no such restrictions or policies exist and the requested discovery is consistent with the type of discovery available in the Chinese proceedings. Accordingly, this factor weighs in API's favor.").

### 4. After some narrowing, the requests are not unduly burdensome

Once a court has determined that discovery through § 1782 is not being used to circumvent discovery restrictions in a foreign jurisdiction, "the ordinary tools of discovery management, including Federal Rule of Civil Procedure 26, come into play; and with objections based on the

fact that discovery is being sought for use in a foreign court cleared away, section 1782 drops out." *Husayn v. Mitchell*, 938 F.3d 1123, 1128 n. 9 (9th Cir. 2019). "In other words . . . the ordinary rules of civil procedure relating to discovery shift into place." *Id.*; 28 U.S.C. § 1782(a) ("The order may prescribe the practice and procedure . . . for taking the testimony or statement or producing the document or other thing. To the extent that [it] does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.").

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Discovery "is permitted if reasonably calculated to lead to the discovery of admissible evidence." *Franklin v. Madden*, 586 Fed. Appx. 431, 432 (9th Cir. 2014). A subpoena must "command each person to whom it is directed to do the following at a specified time and place: attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control; or permit the inspection of premises." Fed. R. Civ. P. 45(a)(1)(A)(iii).

The Court asked the parties to provide supplemental briefing on how each document request relates to the CIETAC arbitration and Hainan court proceeding. In response, Applicants grouped together their document requests into six categories. The Court will respond to the parties' arguments against each of those categories.

### a. The Subpoenas to Produce Documents

I. <u>Category A</u>

Applicants assert that the first category, comprising document requests ("DR") 1-5 of the Hu Yihan subpoenas, JX 1, relate to Hu Yihan's transfer of her controlling stake in Ciming without the notice and consent require by the Collaboration Agreement, and are therefore relevant to the CIETAC breach-of-agreement claim.

Respondents counter that DRs 1 and 2 have no relevance because "the issue in the CIETAC Arbitration is whether Applicants were given adequate notice of the transfer, not anything related to the transfer itself." Supp. Decl. of Dr. Guanglei Zhang in Supp. of Mot. to Quash ("Supp. Zhang Decl."), Ex. A ("Resp'ts' Chart") 1, ECF NO. 42-1. But in Ciming's Statement of Defense in the CIETAC arbitration, Ciming argued that it did not breach the parties' agreement because "there was no change in control. The actual controller of Ciming was and has always been Xiaohong Han. Therefore, there is no need to seek HRC's prior consent." 2d Supp. Zheng Decl. ¶ 24, ECF No. 43-1. Thus, Ciming has put the issue of Ciming's transfer in dispute. Additionally, even if the issue of the transfer were not disputed, documents related to it might lead to relevant evidence about the circumstances of the transfer (such as if any money was paid in return). Those requests are relevant.

Respondents argue that DRs 3 and 5 are of minimal relevance and are burdensome because the information sought in those requests is in the Applicants' possession. Applicants argue that they seek to prove a negative, namely, that Respondents did not give the notice and obtain the consent required by the contract that Yihan Hu signed. These DRs are sufficiently relevant, and the burden on Respondents in producing documents responsive to them would be minimal, if Ciming did in fact provide notice of or get approval for the transfer.

Lastly, Respondents assert that DR 4 is of minimal relevance and burdensome, because, "[w]hile relevant to the CIETAC Arbitration, Yihan Hu is not in possession of this information, whereas Applicants presumably are, as they (and not Yihan Hu personally) were parties to the Collaboration Agreement." Resp'ts' Chart at 2. This argument finds its roots in Respondents' assertion that although Hu Yihan signed the Collaboration Agreement on Ciming's behalf, she did so only as a "proxy of [Han Xiaohong], and served as the legal representative of Ciming on behalf of Dr. Han." Decl. of Yihan Hu in Supp. of Mot. to Quash, ¶ 3, ECF No. 15-2. But this argument doesn't pass the smell test. For one thing, Respondents never really explain how Hu could be "just the legal representative" of Ciming but have *no* knowledge about the control or management or operation of Ciming. Applicants' Chinese counsel, Zheng Rungao, explained that "[u]nder Chinese law, the 'Legal Representative' of a corporation is the person who has the power to enter

into binding contractual obligations on behalf of the corporation, without any further approvals. Because this is an important responsibility, the legal representative is typically the controlling shareholder and is often the Chairman and/or CEO of the Company."  Decl. of Patrick (Rungao) Zheng in Supp. of Opp'n to Mot. to Quash ¶ 22, ECF No. 17-2.  Additionally, a Company Registration Application from October 2016, submitted by Ciming to the local Qionghai government, listed Hu Yihan as both the "Legal Representative" and "Executive Director" of Ciming, as well as 95% shareholder.  *Id.* ¶ 23, Ex. 1.  Zheng explained that "[i]n a Chinese corporation, the 'Executive Director' is generally the person with ultimate authority to make decisions, similar to the Chairman of the Board of Directors."  *Id.* ¶ 23.  Also, a "Permit to Practice for Medical Institutions" was issued by the Chinese government in December 2016.  *Id.* ¶ 24, Ex. 2.  That Permit, which authorized Ciming to provide medical services, identified Hu Yihan as both "Legal Representative" and "Main Person in Charge."  *Id.*  Zheng explained that "as indicated by the plain language, 'Main Person in Charge' means that Yihan Hu has primary responsibility for the overall operations of Ciming Hospital."  *Id.* ¶ 24.

Hu asserts that regardless of her title as "Legal Representative," she never "controlled" Ciming and that Ciming was controlled by Han Xiaohong at all relevant times.  Supp. Decl. of Yihan Hu ¶ 6, ECF No. 1.  But that's not the representation she made to Applicants, or to the Chinese authorities.  And having also listed her as the Executive Director of Ciming and the "Main Person in Charge," Respondents cannot now just flatly assert that all that really meant nothing and Hu really had no control or knowledge of what was going on.  Lastly, Hu Yihan owned a 95% stake in Ciming.  She asserts that she was a "registered shareholder without any equity interest," and that, "[a]ctually, [Han Xiaohong] was the real equity interest holder and real controller of Ciming."  Decl. of Yihan Hu in Supp. of Mot. to Quash ¶ 3, ECF No. 15-2.  But she never really explains how that could be, or what it meant for her to be just a proxy of Han.  Her attempts at explanation raise more questions than they answer.

The Court finds DRs 1-5 are relevant to the CIETAC claims and that the requests are not overly burdensome.  Those DRs will not be quashed.

II.     Category B

21

Applicants assert that the second category, comprising DRs 6-8 of the Hu Yihan subpoena, relate to Ciming's negotiation, performance, and breach of the collaboration agreement, and are therefore relevant to the CIETAC breach-of-agreement claim.

Regarding DRs 6 and 7, Respondents assert that they have minimal or no relevance, and that the documents would already be in Applicants' possession. Applicants assert that these documents will aid in interpretation of terms of the Collaboration Agreement that are disputed in the CIETAC Tribunal. At the motion hearing, Applicants also explained that under Chinese law, there is no rule comparable to the parol evidence rule under United States law and thus the documents requested in DRs 6 and 7 can be relied upon to a greater extent in the CIETAC proceeding than they would be in a U.S. court proceeding. *See* CISG-AC [Advisory Council of the Convention of International Sale of Goods], Opinion No. 3, "Parol Evidence Rule, Plain Meaning Rule, Contractual Merger Clause and the CISG," P 1.2.8 (Oct. 23, 2004), www.cisg.law.pace.edu/cisg/CISG-AC-op3.html (visited Feb. 25, 2020) ("The civil law generally does not have jury trials in civil cases and civilian jurisdictions usually do not place limits on the kind of evidence admissible to prove contracts between merchants."). The Court finds the documents are potentially relevant. Also, Respondents assert that Applicants already have these documents, but that might not be the case, and the burden on Hu to produce the documents should not be significant in any event.

Regarding DR 8, Respondents assert that Hu Yihan has no personal knowledge regarding the alleged breach of the Collaboration Agreement. *See* Decl. of Yihan Hu ¶ 6, ECF No. 15-2. Yet that assertion is hard to believe, for the reasons stated above. Also, Hu asserts that she was not involved with Ciming after December 2017 except for "translation assistance to [Han Xiaohong] on two occasions." *Id.* However, a former Supervisor of HRC-China stated that Hu Yihan participated in at least two meetings in Shanghai in 2018, where there were discussions on strategies on how HRC-China would obtain government approvals for the IVF Center. Decl. of Wang Li in Supp. of Opp'n to Mot. to Quash ¶ 12, ECF No. 17-1. According to Wang's recollection, Hu did not participate in those meetings solely as an interpreter. *Id.* Applicants should be allowed to test Hu Yihan's assertion that she didn't know anything about the alleged

breach of the Collaboration Agreement. And DR 8 only requests documents going back to March 1, 2019; this is a reasonable time period, so the request is not unduly burdensome.

DRs 6-8 will not be quashed.

III.  Category C

The third category includes only one request, DR 9 of the Hu Yihan subpoena. Applicants seek all documents related to the control and/or operation of the IVF Center from March 1, 2019 to now. They assert this request is relevant to their claim in the CIETAC arbitration that Ciming unlawfully seized the IVF Center, as well as to their claim that Ciming misappropriated their assets and intellectual property. Respondents assert that Hu Yihan has no relevant knowledge responsive to this request. For the reasons already discussed, Applicants will be allowed to test that assertion. The time period specified in the request is reasonable, given the events alleged. The Court will not quash DR 9.

IV.  Category D

The fourth category of DRs includes DRs 10, 11, and 18-22 of the Hu Yihan subpoena; DRs 9-13 of the HuHanTwo subpoena; and DR 8 of the HuHanThree subpoena. Applicants assert these requests relate to Ciming's receipt, use, and disclosure of their proprietary information and intellectual property, including to U.S. doctors and fertility centers. They assert the DRs are relevant to the CIETAC misappropriation and breach-of-agreement claims.

Respondents only objection vis-à-vis DRs 10 and 11 is that "Yihan Hu was not involved in running Ciming hospital or operating the IVF Center." Resp'ts' Chart at 4. But as discussed above, the evidence raises significant doubt about that assertion. Also, the requests are relevant. The Court will not quash them.

DRs 18-22 of the Hu Yihan subpoena relate to fertility centers operated by or planned to be operated by Respondents in California or New York, as well as IVF or fertility services provided by Respondents. Respondents object that these DRs are either not relevant or that Hu Yihan has no relevant or substantive knowledge. While the Court does find these requests relevant, several of them are overly broad or call for documents related to the operation of fertility clinics by Respondents "at any time after January 1, 2015." Hu Bo and Han Xiaohong have

operated a fertility clinic in New York City since 2014, but Applicants and Ciming didn't enter into the Collaboration Agreement until September 2017, so Applicants intellectual property and proprietary information couldn't have made it into Respondents' hands before that time. Additionally, DR 21 is of questionable relevance.

The Court will quash DR 21 of the Hu Yihan subpoena. It will limit DRs 18, 19, 20, and 22 to documents responsive to any time after September 10, 2017. The Court will further limit DRs 20 and 22 to responsive documents that relate to IVF operation or IVF business activities. If, as Hu Yihan asserts, she does not have control, custody or possession of documents requested in these DRs, then she does not need to produce them. The corresponding DRs in the HuHanTwo subpoena (DRs 9 to 13 of the HuHanTwo subpoena) will be quashed or limited in the same way. DR 8 of the HuHanThree subpoena is similarly limited to documents responsive to any time after September 10, 2017.

V.    Category E

The fifth category of DRs includes DRs 12 and 23-26 of the Hu Yihan subpoena; DRs 5-7 of the HuHanOne subpoena; DRs 6-8 of HuHanTwo subpoena; DRs 5, 6, 8, and 9 of the HuHanThree subpoena; and the Wells Fargo subpoenas. Applicants assert these requests relate to the assets of Ciming and Respondents, and that they are relevant to the asset freeze and proof of a potential fraudulent transfer.

DR 12 of the Hu Yihan subpoena relates to the location, identity, and amounts of Ciming's assets. Hu asserts that she has no knowledge regarding Ciming's assets, but for the reasons discussed above, Respondents will be allowed to test that assertion. The Court will not quash that request.

DRs 23, 24 and 25 of the Hu subpoena relate to bank and brokerage accounts in her name, as well as to property or companies in which she has a legal or financial interest. Respondents assert that these requests have no relevance or are unduly intrusive into Hu's personal information. But according to Hu's own admissions, she once entered into a Collaboration Agreement and owned a 95% stake in Ciming, and she asserts this was as a "proxy" for her mother, Han Xiaohong. This suggests she might have access to assets owned by her mother. Additionally, Hu

24

formed the three HuHan entities.  Hu Bo owns a 100% equity interest in two of those, HuHanOne

and HuHanTwo.  Hu Yihan is the 100% equity owner of HuHanThree.  HuHanTwo and

HuHanThree share an address.  Hu Yihan manages all three entities.  Hu Yihan discloses that the

three entities purchased real estate in the Bay Area using her parents' funds.  Hu Y. Decl. ¶ 12.

The combination of these connections suggests that Hu Yihan might have access to those entities'

accounts, or that assets of Hu Yihan might be co-mingled with assets of Hu Yihan and Hu Bo.

The DRs are relevant, and not unduly intrusive.  The Court will not quash them.  Nevertheless, the

Court will limit DR 23 of the Hu Yihan subpoena to the time period from September 10, 2017 to

the present, the period after the parties entered into a Collaboration Agreement.

For the reasons just outlined, the Court will also not quash the Wells Fargo subpoenas.

Those subpoenas might additionally lead to documents related to Hu's transfer of her 95% stake in

Ciming to her Han, in breach of the Collaboration Agreement.

The Court will quash DR 26 of the Hu Yihan subpoena, asking for information on her tax

identification number, as well as all the DRs relating to Respondents' tax identification numbers

(DR 7 of the HuHanOne subpoena; DR 8 of the HuHanTwo subpoena; DR 9 of the HuHanThree

subpoena); those have no apparent relevance.  Applicants say they could use tax identification

numbers to perform asset searches, which could potentially lead to finding other relevant

information.  However, that connection is too attenuated from the pending proceedings, to which

the tax identification numbers are not themselves relevant.  The rest of the DRs in this category

will not be quashed.

VI.     Category VI

The sixth category of DRs includes DRs 13-17 of the Hu Yihan subpoena; DRs 1-4 of the

HuHanOne subpoena; DRs 1-5 of HuHanTwo subpoena; and DRs 1-4 of the HuHanThree

subpoena.  Applicants assert these requests relate to the transfer of Ciming assets to Respondents

and related entities, funds for real estate bought by HuHan entities, and control and operation of

HuHan entities, and that they are relevant to the asset freeze and proof of a potential fraudulent

transfer.

DR 13 is clearly relevant to the asset seizure matter, and it is not unduly burdensome.  Hu

25

Yihan asserted that the HuHan entities never received any funds from Ciming, but Applicants will be allowed to test that assertion, and that assertion does not speak to whether any of the other Respondents or their entities received assets from Ciming. Nevertheless, the Court will limit the time frame for that request to at any time since September 1, 2017—the date the Collaboration Agreement was signed.

DRs 14-17 are also all relevant. Hu Yihan or her two parents, the owners of Ciming, are the 100% owners of all three of those entities. Hu Yihan apparently sold her 95% stake in Ciming to Han Xiaohong in December 2017, in breach of the Collaboration Agreement. Knowing if those entities received assets from China might allow Applicants to trace those transfer back to sources in China, enabling Applicants to obtain a Chinese court order attaching additional assets still located at those sources in China. Supp. Decl. of Zheng in Supp. of Mot. to Compel ¶ 29, ECF No. 41-1. Also, the requests are targeted enough and are not unduly burdensome. The Court will not quash those requests.

For the same reasons, the following DRs are relevant and not unduly burdensome, and will not be quashed: DRs 2 and 4 of the HuHanOne subpoena; DRs 2, 3, and 5 of the HuHanTwo subpoena; and DRs 2 and 4 of the HuHanThree subpoena. However, DRs 1 of the three entities' subpoenas are of little or no relevance, and are unduly burdensome, and will be quashed. DR 3 of the HuHanOne subpoena, DR 4 of the HuHanTwo subpoena, and DR 3 of the HuHanThree subpoena are also of little or no evidence and will be quashed.

The remaining request is DR 7 of the HuHanThree subpoena. Applicants do not include this request in any of their six categories. The Court finds it of limited relevance and overly broad and burdensome and will quash it.

### b. The Subpoenas to Testify

Here, Applicants seek to depose Hu Yihan and the three entities under Rule 30(b)(6). As a general matter, "depositions of corporate officers are standard practice in U.S. civil litigation and are not burdensome." *In Re Appl. of Illumina Cambridge Ltd. for issuance of subpoenas under 28 U.S.C. § 1782*, 2019 WL 5811467, at *5 (N.D. Cal. Nov. 7, 2019). The Rules of Civil Procedure themselves ensure that the length, time and place of the deposition do not impose an undue

burden. *See* Fed. R. Civ. P. 45(d)(1). Based on the earlier discussion, the Court finds that Hu Yihan is likely to have relevant information responsive to the subpoenas for testimony. As the manager of the LLCs, she can testify as a managing officer on those entities' behalf.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Respondents' Motion to Quash and Applicants' Motion to Compel as follows:

- The Court **QUASHES** requests 21 and 26 of the Hu Yihan subpoena; 1, 3 and 7 of the HuHanOne subpoena; 1, 4, 8 and 12 of the HuHanTwo subpoena; and 1, 3, 7 and 9 of the HuHanThree subpoena.

- The Court **COMPELS** Respondents to produce documents responsive to requests 1-12, 14-17, and 24-25 of the Hu Yihan subpoena; 2, 4, and 5-6 of the HuHanOne subpoena; 2, 3, and 5-7 of the HuHanTwo subpoena; 2 and 4-6 of the HuHanThree subpoena; and records specified in the Wells Fargo subpoenas[8].

- The Court **COMPELS** Respondents to produce documents responsive to the following requests for the time period on or after September 10, 2017: requests 13, 18, 19, and 23 of the Hu Yihan subpoena; 9 and 10 of the HuHanTwo subpoena; and 8 of the HuHanThree subpoena.

- The Court **COMPELS** Respondents to produce documents responsive to the following requests for the time period on or after September 10, 2017 if they relate to IVF services or IVF business activities: requests 20 and 22 of the Hu Yihan subpoena, and 11 and 13 of the HuHanTwo subpoena.

- The Court **COMPELS** the deposition of Hu Yihan and the Rule 30(b)(6) depositions of HuHanOne, HuHanTwo and HuHanThree.

Documents shall be produced by March 6, 2020. This Order does not relate to the subpoenas which Applicants have not yet served on Respondents Hu Bo or Han Xiaohong.

**IT IS SO ORDERED.**

---

[8] Applicants indicated at the motion hearing that Wells Fargo has already produced to them records responsive to the subpoenas served on it.

United States District Court
Northern District of California

Dated: February 25, 2020

THOMAS S. HIXSON
United States Magistrate Judge